UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                 Criminal No. 25-20543

v.

                                 Honorable Judith E. Levy

D-1 CEMHAN "JIMMY" BIRICIK,

      Defendant.

---

## GOVERNMENT'S RESPONSE OPPOSING DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER [ECF No. 24]

---

Defendant Cemhan Biricik, the alleged mastermind of a half-billion dollar fraud scheme is a flight risk. He has a history of regular international travel, family ties abroad, and is facing a significant custodial sentence. Further, he has presumed access to millions in as-yet-unaccounted for fraud proceeds. Accordingly, he poses a risk of non-appearance that no conditions of release can reasonably address.

As discussed further in the government' brief, the Court should affirm the decision of U.S. Magistrate Judge Midori Lowry and deny Biricik's motion to revoke the detention order or re-open the hearing.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

     Plaintiff,

                                 Criminal No. 25-20543

v.

                                 Honorable Judith E. Levy

CEMHAN "JIMMY" BIRICIK,

     Defendant.

_____/

**Government's Brief in Support of its Response Opposing Defendant's
Motion for Revocation of Detention Order [Ecf No. 24]**

Cemhan Biricik, a self-described "Serial Entrepreneur with an advanced skill set in Marketing + Branding + Design"[1] asks the court to take him at his word that he will stay and face the charges against him, rather than flee the country to avoid the realistic possibility of spending upwards of 20 years in custody.

Biricik is alleged to have orchestrated a simply massive healthcare billing fraud through his company Fast Lab Technologies, by submitting claims for Covid-19 testing services that were either never provided at all, or up-coded to inflate the amount of the reimbursement. In total, Fast Lab submitted more than

---

[1] LinkedIn, https://www.linkedin.com/in/cemhan, last accessed October 10, 2025.

$500M in claims for testing services and was paid more than $50M by federal

health programs and private insurers; much of that money has yet to be accounted

for.   He has strong ties abroad and significant incentive to flee.   The risk of his

non-appearance is of the sort that cannot be mitigated by conditions. The Court

should affirm the prior order of detention from the Northern District of Florida.

### Background & Procedural History

The indictment in this case charges Biricik with (i) conspiracy commit

health care fraud, in violation of 18 U.S.C. § 1349, and (ii) fifty-eight counts of

health care fraud, in violation of 18 U.S.C. §1347. (ECF No. 1).   The indictment

was unsealed on July 31, 2025, when Biricik and his co-defendant Dr. Martin

Perlin were arrested, and multiple search warrants were executed at various

locations in three districts.   Biricik was taken into custody in the Northern District

of Florida and had his initial appearance in Gainesville.   The government sought

his detention, and a hearing was held the following day pursuant to 18 U.S.C. §

3142(f).   At the conclusion of that hearing, U.S. Magistrate Judge Midori Lowry

ordered him detained; a written order to that effect was filed later that day.

(U.S v. Biricik, 25-mj-28-MAL, N.D.FL, Dkt. 9, Aug. 1, 2025). In her order, Judge

Lowry wrote that, "the Government showed that Defendant has motive, means,

and ability to flee," and went on to discuss (i) the length of his potential sentence,

(ii) the millions in unaccounted fraud proceeds, and (iii) his foreign ties and familiarity with international travel, ultimately finding that, "[t]he Government's proffer was more than sufficient to show by a preponderance of the evidence that the Defendant poses a serious risk of flight." The court then considered the factors set forth in 18 U.S.C. § 3142(g), concluding that "no conditions or combination of conditions will reasonably assure his presence as required."

## ARGUMENT

No condition or combination of conditions can reasonably assure Biricik's appearance at future proceedings should he be released on bond.   Biricik's motion to revoke his detention order should be denied.

A defendant may be detained pending trial if the Court finds that no condition or combination of conditions will reasonably assure the defendant's appearance as required or the safety of any other person or the community.   18 U.S.C. § 3142(e).   The government must prove risk of flight by a preponderance of the evidence and danger to the community by clear and convincing evidence. *United States v. Hinton*, 113 Fed. App'x 76, 77 (6th Cir. 2004) (internal citations omitted).   When evaluating whether a defendant should be detained, the Court is to consider: (i) the nature and circumstances of the charges; (ii) the weight of the evidence as to risk of non-appearance; and (iii) the history and characteristics of

the defendant. 18 U.S.C. § 3142(g).   The Court's review of Magistrate Judge

Lowry's conclusion that detention is warranted is *de novo*. *United States v. Stone*,

608 F.3d 939, 945 (6th Cir. 2010).

## I.        Biricik Should be Detained Based on Risk of Nonappearance

The risk of non-appearance presented in this case does not turn on any one

fact in isolation, but on the totality of the facts and circumstances taken together.

### A. Nature and Circumstances of the Offense

The first statutory factor to consider is the nature and circumstances of the

offense charged.   18 U.S.C. § 3142(g)(1).   Here, the nature of the offense is a

years-long conspiracy wherein Biricik is alleged to have stood up a company that

submitted a full half-billion-dollars in claims for Covid-19 testing, much of which

was either never conducted or not performed as billed, touching on virtually every

state and a significant number of federal health programs. Biricik himself is a

master of reinvention, starting first with a computer parts and systems e-commerce

company; transitioning into branding, marketing, and photography; and

transitioning again into the healthcare space. *See* LinkedIn.com/in/Cemhan. Taken

together, this demonstrates Biricik's proven ability to (1) innovate, (2) organize,

and (3) take action; all skills that would aid him in fleeing, if he were to decide it

were in his best interest to do so.

5

The circumstances of the charged offense also involve the generation of millions and millions of dollars in illicit gains, much of which was moved repeatedly between bank accounts and a significant portion of which appears to have been poured into investment accounts and cryptocurrencies: the government identified evidence of a crypto "wallet" during execution of the resident search warrant at Biricik's house, and previously identified a Robinhood investment account with approximately $1M that was transferred into either crypto-currencies or crypto securities—the government's further tracing of these funds remains ongoing. There is a level of financial sophistication inherent to these transactions that suggests an ability to make and acquire funds to finance international travel. At least one third party with whom Biricik has a close personal relationship also received a large amount of money from the scheme, which Biricik could conceivably have access to upon release.

The charged conduct also involved using the PII of thousands of customers to submit insurance claims and concealing the truth of the fraud from many of his own employees. These are significant risk factors for nonappearance, because they speak to a willingness and ability to use deceit.   *See, e.g.*, *United States v. Jones*, 2011 WL 6300957, at *2 (W.D. Tenn. Dec. 16, 2011) (detention warranted based

6

on risk of flight where defendant's "access to other people's personal information makes it likely that he could conceal his identity in order to flee").

Moreover, the nature of the charged offense is that it involves extremely significant potential penalties for Biricik.   Each of the charged counts carries a maximum of 10 years in custody; if he were to be convicted of all counts and those sentences were to run consecutive, his maximum potential exposure is 590 years. Realistically though, given: (i) the dollar value of the claims involved in the conspiracy, (ii) the fact of it being a federal health care offense, (iii) the sophistication and methods involved, and (iv) his role in the offense, the government calculates that Biricik's sentencing guideline range will <u>very likely exceed 20 years imprisonment</u>.   As noted in the defendant's motion, his lack of criminal history means that he had never been in custody before his detention in this case.   Having now experienced a restriction on his freedom, this lengthy potential penalty presents a powerful incentive to flee if released.   *See United States v. Abboud*, 42 F. App'x 784, 785 (6th Cir. 2002) (affirming detention based on risk of flight where, among other factors, motive for flight was "strong" based on defendant facing "further investigation, state and federal sentences, and burdensome financial conditions"); *United States v. Runnerstrand*, 2008 WL 927774, at *3 (E.D. Mich. Apr. 4, 2008) (detention warranted based on risk of

7

flight where defendant faced significant penalty, had experience and ability to travel internationally, and home was near an international border).

## B. History and Characteristics of the Defendant

Biricik's history and characteristics—another of the statutory factors to consider—reinforce these same risk factors for nonappearance.   18 U.S.C. § 3142(g)(3).

First, as discussed in the prior detention hearing (and in the defendant's own motion), Biricik has a history of international travel. While the defense paints this as innocuous vacation travel, it still shows an ability to manage one's affairs abroad. He has a documented history of travel-related spending, including for hotels and taxi and limousine services. And once outside the United States, the ease of travel between countries increases almost exponentially.

Next, the defendant has trained as a pilot and has familiarity with private air travel. In raising this, the government does not mean to suggest that Biricik himself would be able to fly a plane to Turkey. Rather, the government would highlight the simple reality that Biricik has the knowledge and ability to travel by way of non-commercial flights.[2] Because while piloting a private plane to Turkey himself

---

[2] Relatedly, during the seizure of Biricik's plane, the government also learned from a "hanger neighbor" that Biricik had previously remarked he had ordered a second

would almost certainly be impossible, piloting a private plane (or acquiring seats

on a private flight) to a permeable land boarder, or into a neighboring country, is

hardly improbable. In fact, between the prospect of (1) acquiring a false identity

and fraudulent international travel documents and purchasing tickets on a

commercial flight, or (2) simply chartering a plane to a state with a land-border,

walking across, and arranging further travel from there… the second option seems

*far* more likely.

Regardless of whether private plane travel may be preferable, it cannot be

wholly discounted that given sufficient motivation—which the government alleges

is present here—and connections abroad, it would not be outside the realm of

possibility that the defendant could endeavor to procure a set of passable Turkish

travel documents and use those to leave the country.

The defendant's ties to Turkey should also not be understated. Regardless of

whether Biricik's father is a "hermit"—a statement for which there has been no

corroboration—there is no dispute that his father does, in fact, live in Turkey. The

---

plane. Based on conversations with the FAA, if such a plane were on order, the
company likely required a substantial downpayment (if not prepayment in full). The
government's investigation into this information remains ongoing; however, if
Biricik were able to take delivery of the plane he would have ready means to travel
and if he were able to refund the transaction, he could have several hundred
thousand dollars made available to him.

country where the defendant was born. And where the defendant was originally set to travel the week after his arrest.   His aunt's motivation for being in Turkey is also a red-herring; there is no dispute she was *there* and that Biricik was, ostensibly, going to visit her.   These are closer familial ties to a foreign country than the vast majority of defendants possess.   And when considered alongside the potential penalty he is facing, the motivation to cleave to one's homeland in a moment of great personal significance is self-evident. It also should not be taken lightly that Biricik does not need "succor" from these family members in order to establish himself and his family there, given the high likelihood he still has some access to proceeds from this offense.   On that same point, it is also important to acknowledge the highly favorable exchange rate between the two countries, with $1 currently being equal to approximately $42 Turkish Lira.[3] Regardless, his familiarity and comfortability with a known foreign country is the real point here. This all goes without discussing potential ties to one or more South American countries, which he has revisited as recently as this summer.

Further, the defense motion goes on at length about the potential for his extradition if he were to choose to flee. Putting aside the question of whether he

---

[3]  Western Union, Convert US Dollar to New Turkish Lira,
https://www.westernunion.com/us/en/currency-converter/usd-to-try-rate.html
(last visited Oct. 14, 2025).

*could* be extradited from Turkey, the government would simply note that there are never any guarantees and that it would likely be a lengthy and involved process to repatriate him.   Inherent in the question of whether he could be extradited are also a host of assumptions, including: (1) he arrives in Turkey under his own name and continues to use that name; (2) he stays there as opposed to further relocating elsewhere in the region, to a country that does not extradite; (3) the Turkish authorities are able to locate and arrest him; and (4) Turkish authorities also share the defense assessment that Biricik's offense is eligible for extradition.   The mere fact that the *probability* of various outcomes under international law is being raised in support of a defendant's release should itself give pause—the Court is asked to decide whether there are conditions that can "reasonably assure" his further appearance, not whether it would be impossible or nearly impossible for the government to make him answer the charges at some hypothetical future date.

Finally, as to the reliability of a tether as a means of assuring his appearance, the government would reiterate its belief that a tether is only as good as an individual's willingness to abide the restriction. Here, we have an individual alleged to have engaged in a staggering level of fraud, with foreign ties, and a fair probability of serving decades in federal prison if convicted.   The fact that Pretrial Services—presumably in Florida, where he would likely return and be under

11

courtesy supervision give his lack of ties to Michigan—would receive notice if he were to cut a tether is hardly a reasonable assurance of his future appearance in this district. Because even given perfect communication between all the various agencies, the difficulty inherent to immediately standing up a search for the defendant (in hopes of arresting him before he could escape the jurisdiction) poses simply too great a risk. Government counsel has also personally been party to cases wherein a defendant slipped a tether without triggering an alarm; suffice it to say, it can be done.

Given the potential penalties Biricik faces and his documented facility with travel outside this country, there is high risk of flight at a baseline. As the gravity of the allegations and potential penalties in this case sink in, the motivation to flee will likely only increase. And for the reasons discussed above, Biricik's myriad professional skills and presumed ability to generate significant income; the as-yet-unaccounted for proceeds of the charged conduct; his ties to Turkey and potentially other countries; and his facility with both private air travel specifically and international travel more generally, collectively establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure his appearance.

12

## **<u>OPPOSITION TO REQUEST TO REOPEN HEARING</u>**

As stated in the defense motion, a detention hearing may be "reopened, before or after a determination by the judicial officer … if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person[.]" 18 U.S.C. § 3142(f)(2).   Here, Biricik was represented at his detention hearing by highly experienced counsel (herself a former federal prosecutor), and nothing raised in the defense filing appears to have been unknown to Biricik himself.   Whether current counsel has learned information *they* believe to be material that prior counsel did not make use of is a separate question, and one that is outside the scope of the standard for re-opening the hearing.   In broadest strokes, the arguments being proffered by both sides on the operative questions of likelihood of nonappearance and reasonable assurance of future appearance are the same arguments advanced by the parties in front of Magistrate Judge Lowry.

Accordingly, the government does not believe that the hearing needs to be re-opened and would ask the Court to decide the motion on the basis of the briefs.

## **<u>CONCLUSION</u>**

For the aforementioned reasons, a preponderance of the evidence establishes that no conditions or combination of conditions can reasonably assure Biricik's appearance.   Biricik' s motion to revoke his detention order should be denied.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

*s/ Ryan A. Particka*
Ryan A. Particka
Regina R. McCullough
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9635
Ryan.particka@usdoj.gov

Date:   October 15, 2025

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2025, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF, which will provide

electronic notice to counsel of record.


<u>*s/ Ryan A. Particka*</u>
Ryan A. Particka
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9635
Ryan.particka@usdoj.gov

15